UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * *

FURGUS WILSON,
Plaintiff

-against- C.A. NO. 05-CV-324ML

STILES MACHINERY, INC.,
Defendant.

* * * * * * * * * * * * * * * * *

DEPOSITION OF FURGUS WILSON, PLAINTIFF in the above-entitled cause, taken on behalf of the DEFENDANT, before Julia A. Puleo, RPR, a Notary Public in and for the State of Rhode Island, at the Law Offices of Hinckley, Allen & Snyder, 1500 Fleet Center, Providence, Rhode Island, on January 30, 2006, at 11:00 A.M.

PRESENT:

FOR THE PLAINTIFF..... JEFFREY D. POLLACK, ESQUIRE
MINTZ & GOLD, LLP
470 PARK AVENUE SOUTH
NEW YORK, NY 10016

FOR THE DEFENDANT..... PAUL T. SORENSEN, ESQUIRE
WARNER NORCROSS & JUDD, LLP
111 LYON ST., N.W.
GRAND RAPIDS, MI 49503

ALSO PRESENT:
MICHAEL CALLAHAN, DIRECTOR OF OPERATIONS, GENERAL COUNSEL, STILES MACHINERY, INC.

MICHAEL F. KRAEMER, ESQUIRE, HINCKLEY ALLEN

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

right?
A. Yes.
Q. And you're saying over the last four years, the amount of effort you were putting into the technician part of the job increased from the first two or three years you were there, right?
A. Yes.
Q. Does that mean, then, that the total number of hours you were working must have gone up in that period of time, compared to the first three years or so, true?
A. It varied.
Q. What do you mean by that?
A. It depended on how long the technicians were working, and I had to support and work with them. You had some technicians that didn't want to work weekends, you had some that did, you had some technicians that didn't want to work Sundays, you had some that did. The bottom line is, I was the last person turning the lights off.
Q. What does that mean?
A. That means I had to stay until the technicians, everybody on the project, was finished working, and in various facilities you cannot leave a technician there working by



themselves.
Q. So as long as there was one or more technicians working on the site, you had to be there because, I mean, you were in charge there, right?
A. Yes.
Q. Now when you talk about technicians, let me explore that a little bit with you to make sure I understand. There were employees of Stiles who were technicians that would work on those project sites, right?
A. Yes.
Q. And there were also employees of other companies, the manufacturers of the equipment would send people to these sites as well, true?
A. Yes.
Q. So when you use the word "technicians," are you applying that to both the Stiles technicians and the manufacturers' technicians?
A. Yes.
Q. How did what the Stiles technicians do differ from what the manufacturers' technicians did, and maybe there wasn't any difference, I just don't know, but I need you to explain that to me?
A. The manufacturers' technicians were more knowledgeable about their equipment than the



Stiles technicians, so basically the Stiles technicians would install the equipment, and after a period of time the manufacturers' technicians would fly over, go to the company site, and finish off the equipment as far as modifying the software, putting retrofits on the equipment, and making sure it was running smoothly.
Q. I've seen documents to suggest this is true, but there were periods of time where you had technicians from both Stiles and the manufacturers there at the same time, right?
A. Yes.
Q. But I think I'm hearing you say there were also times when there'd just be Stiles people there, and there'd be times when there were just manufacturers' people there, right?
A. Yes.
Q. In connection with these projects, how often did it happen that there were no technicians there, I mean, none at all, none from Stiles, none from the manufacturers?
A. Numerous times.
Q. And why would that be?
A. That would be because the technicians were allowed every two weeks to go home for the



weekends, that's one reason. It would be because the manufacturers' technicians were only allowed a certain period of time to be here in the states because of their visa, it would be because the project was completed and they were done with the job.
Q. Let me just talk about the last project specifically, then we can talk about some of the other ones, but on the Monarch project, there was equipment there from how many different manufacturers?
MR. POLLACK: Objection. We're just talking about what Stiles sold and serviced?
MR. SORENSEN: That's right.
A. I believe four different manufacturers.
Q. Which ones were they?
A. Homag.
Q. Let's make sure, for the court reporter, it H-O-M-A-G?
A. Weeke.
Q. W-E-E-K-E?
A. Bargstedt.
Q. I'll have more trouble with that?
A. B-A-R-G-S-T-E-D-T, Holzma.
Q. H-O-L-Z-M-A?

Page 46

A. Gaudnolle.
Q. He was the Monarch guy, right, that you interfaced with?
A. Yes.
Q. Now there must have been a floor plan of some kind where this equipment was going to go?
A. Yes.
Q. So the riggers took it off the truck and put it as close as they could to exactly where it was supposed to go on the plant floor, right?
A. Yes.
Q. I'm missing why, for safety reasons, why you said there needed to be a second guy there to work on that Homag stuff. I mean, obviously, Oovy wasn't moving that on his own?
A. No.
Q. Why did you need a second guy for safety reasons?
A. Because when you move equipment as heavy and bulky and off balance as this equipment, something could -- an obstruction could be in an area where you can't see it, there could be people between the machines, underneath the machines. You need an extra set of eyes to help you move the equipment and set up the equipment.
Q. And Oovy did the best he could, as Homag's

Page 47

representative, to get that done, right?
A. Yes.
Q. Why did you pause there?
A. Because Oovy left a lot of open issues once he went back home finally.
Q. So Oovy was the guy that you were talking about before, that you had some issues with yourself in terms of the quality of his performance, right?
A. Correct.
Q. And when you brought that to the attention of the Homag people in Germany, how did they respond?
A. I wouldn't bring that to the attention of the Homag people in Germany. I'd bring it to my boss's attention, and my boss's boss's attention.
Q. Well, earlier you told me that you actually had communications with the Germans, speaking in German, about those kinds of concerns, so what are you saying, you brought it to two different groups of people's attention?
A. Correct.
Q. All right. The Homag people and, what, Larry and Norbert; is that right?
A. Correct.
Q. Did you suggest that Homag send over somebody who was better than Oovy?

Page 48

A. Correct.
Q. Did they -- was that the second guy you were talking about that seemed to know better than Oovy did on how to get the job done?
A. No. They didn't send anybody. Stiles sent somebody.
Q. I thought you said that Homag sent a second guy over when you made it clear to him that this guy, there was some performance issues with him?
A. Homag always sends a second electrician after the mechanical installation.
Q. Right. I understood you to say that they sent a second install guy; is that not right?
A. They didn't send a second install guy. Stiles sent a second install guy after I complained.
Q. Who was that?
A. Patrick Wemimot.
Q. I've seen his name. So he came after Oovy went back to Germany?
A. Correct.
Q. When was that?
A. I'd say sometime in the spring of 2000 -- what was that, 2003?
Q. Four.

Page 49

A. '04, in the spring. It had to be April or May.
Q. Okay. Did Oovy go back to Germany because you had let it be known that his work was just not good enough, or did he go back because he thought he was done?
MR. POLLACK: Objection. You are assuming that he knows.
MR. SORENSEN: Go ahead.
A. Oovy went back to Germany because he said there was nothing else he could do because of his visa. I think he only had 90-day visas when they came here, it was going to expire soon, and that was it.
Q. So was it your feeling that he was kind of washing his hands of it?
A. It was my feeling that he was leaving me with the problem and he didn't care.
Q. Did you ever talk to Oovy about that before he left?
A. Yes.
Q. You said, look, I mean, we've got issues here with your equipment that needed to be addressed, and they're not getting addressed by you, Oovy, something along those lines?

Page 50

A. Correct.
Q. What was Oovy's response when you raised that with him?
A. It's because of your dumb salesman at Stiles that ordered the incorrect machinery for the application which the customer wanted to use it for.
Q. And you considered that to be a poor excuse, I take it, right?
A. That's what he stated.
Q. I know, and you considered that to be a poor excuse; I mean, I've seen the correspondence about that?
A. Unacceptable excuse.
Q. Sure. Now were you ever told by anybody at Homag why they just didn't send somebody else over on a new 90-day visa?
A. Because due to Oovy's communication, there was no issue on site which was a manufacturer's problem.
Q. But you were informing Homag that wasn't correct, that they had to take some ownership of the problem?
A. I was informing Homag and my boss, yes.
Q. What was Homag's response to that when you're

Page 51

saying, you know, this is something you have to take ownership of, this is something you need to deal with?
A. Their response was, we have to work on a solution, retrofit kits, modification kits, new software, but there is nothing from the list of issues with the equipment that Oovy can fix at the moment.
Q. Was that a common experience that you had with Homag, or had your experiences with them been better before that?
A. As far as open issues with equipment, that's common.
Q. They don't -- they didn't follow through as you felt they should have; is that it?
A. I felt that they could have sent more people and did more.
Q. You were frustrated by that, I take it?
A. That's correct.
Q. Larry and Norbert were frustrated as well, right?
A. That's correct also.
Q. And they, like you, expressed that frustration to Homag, right?
A. That's correct.
Q. But even with all three of you expressing that

Page 52

frustration, you never saw any other tech coming over from Homag except for the electrical guy?
A. No. They didn't send anybody.
Q. Now how much time elapsed between the time Oovy left and the time the electrical guy came?
A. The electrical guy came during Oovy's -- I'm thinking -- his last three weeks on site.
Q. Was he able to get his part of the job done?
A. Yes, to a certain extent, yes.
Q. What do you mean, to a certain extent? You said he was the guy, he did the job well?
A. Yes.
Q. Why did you say only to a certain extent?
A. He interfaced the equipment and got it running, but there was too many programs, where you had different panel sizes, which, either we didn't have the material to test them, for him to test the programs to make sure they were correct, or we didn't have the tooling to cut -- process the panels to make sure the programs were correct.
Q. Now he is communicating these issues to you as the Stiles guy at the site, right?
A. No. He is more so communicating them issues back to his home company in Germany.
Q. Well, but, I mean, in terms of coordinating the

Page 53

effort, you know, that between Homag and Stiles, you and he are the guys on site, so he is expressing those to you, and I assume you then passed that on to Larry or Norbert, or both of them; is that right?
A. Whatever information that I could get from him, I would pass that information on.
Q. You actually had regular reports that you would send back to Larry and Norbert and others, right, to inform them of the status of the project at any particular point in time, right?
A. That's correct.
Q. And included in that reporting would be the kinds of issues that you're saying, hey, we've got these issues, and I'm not really getting clear answers from the Homag guy?
A. That's correct.
Q. Now, I'm sorry. Tell me again the name, I wrote it down here, I think, the name of the Stiles guy that came --
A. Patrick Wernimot.
Q. How would you characterize the quality of his job performance?
A. Patrick is very good at what he does.
Q. So you would characterize his performance as, at

A. I'd say it was -- it's about equal.
Q. And how was that so, given the difference you just described to me?
A. After we installed four multi-million dollar machine lines at Kraftmaid, and during the installation I had to assist with the installation when I wasn't writing reports or talking to the customer, and meetings, because we were short of manpower, and the technicians needed additional hands. After the projects were completed, I was abandoned at the customer for after-installation support. So any light to medium problems on the machines which required conversing with Germany to get answers on fixing equipment, to read engineering machines, and working with local machine shops, and installing the parts on the equipment, or tracking down replacement parts that got shipped to the customer and installing them, that's what I was there to do.
Q. When did the -- when was the installation completed?
THE WITNESS: At Monarch or Kraftmaid?
MR. SORENSEN: We're talking about Kraftmaid now.
MR. POLLACK: That's -- what you just



answered was about Kraftmaid, right?
THE WITNESS: Correct.
A. I believe the last line was installed, or the last saw at Kraftmaid was in September 2003, I believe. I'm not sure.
Q. So when you're talking about this after-installation support, you're talking about from that point until you left Kraftmaid at the end of the year, right?
A. No. I'm talking about I arrived at Kraftmaid, I believe, in June of 2000, and each machine line that we finished, the technicians left and I stayed at Kraftmaid on site fixing issues with the equipment.
Q. Well, you were there anyway? I mean, you were there until the total installation was done, right, that was part of your job?
A. Correct.
Q. So it's not like you stayed longer than you were otherwise going to, you were there anyway, right?
A. There was no other projects going on, yes.
Q. And that's what it turned out to be, you were there for two years, right?
A. Yes. A little bit more than two years.
Q. Now let me just go back a minute. I want to make



sure that I've got everybody that were the Stiles technicians that worked at Monarch. I mean, you have given me Patrick's name. What other Stiles technicians worked at Monarch?
A. Volkmar Ege. That's V-O-L-K-M-A-R E-G-E, Brett Silva, David Maze, Neal, I don't remember his last name, he works for Holzma US. That's it.
Q. All right. Now, you said that Patrick worked specifically on the Homag line?
A. That's correct.
Q. What about Volkmar?
A. Volkmar worked specifically on Bargstedt.
Q. And Brett?
A. He worked specifically on Holzmas.
Q. And David?
A. Holzmas.
Q. I take it Neal did, too?
A. Holzmas.
Q. Now what about Kraftmaid; what technicians from Stiles worked with you there?
A. Patrick Wernimot, Volkmar Ege, Tom Harjung.
Q. What's the last name?
A. Harjung.
Q. H-A-R-J-U-N-G?
A. Correct. Tim Robson, David Villereal,



Don Pledger, Lorenzo Bavoni.
Q. Do you need to look at your letter here to refresh your memory?
A. Right, to jog some more names. I'm trying to think.
(WITNESS REFERS TO DOCUMENTS)
A. David Maze was there. Brett Silva was there.
THE WITNESS: Did I say Brett Silva?
MR. SORENSEN: Not on that one.
A. That's all I can recollect for now. I know some faces, but I don't recollect their names.
Q. Were these technicians assigned to specific manufacturers' equipment like they were at Monarch?
A. Correct.
Q. Patrick was assigned to what?
A. Homags.
Q. What about Tom Harjung?
A. Holzma.
Q. Tim Robson?
A. Bargstedt.
Q. David Vill --
A. Villereal, Heian.
Q. Say that again?
A. Heian routers, H-E-I-A-N.

Island at the time?
A. I had one boy living with me in Rhode Island at the time.
Q. Who was that?
A. My son, Timo.
Q. Spell that, please.
A. T-I-M-O.
MR. SORENSEN: Let's mark this next exhibit.
(DEFENDANT'S EXHIBIT C MARKED FOR I.D.)
Q. We've been talking a fair amount about what you were doing to fulfill what you referred to as the work of a technician here. I want to talk a little bit about what your job responsibilities were as project manager, and I've asked the court reporter to mark as Exhibit C the job description for that job, and that's your signature on the last page of that, isn't it?
A. Yes, it is.
Q. Now when is the last time you looked at this document?
A. Probably when I sent it to Jeff.
Q. By the way, did you do anything to prepare for your deposition today?
A. No.



Q. Did you meet with Jeff?
A. We had dinner last night.
Q. Did you talk about the deposition coming up?
A. Yes.
Q. Did you look at any documents?
A. No.
Q. In the last week, have you looked at any documents?
A. I have looked at some documents within the last week.
Q. Pertinent to the issues in this deposition, in this lawsuit?
A. Pertinent to travel here.
Q. Well, I'm talking about pertinent to your employment at Stiles.
A. No.
Q. Did you meet with Jeff this morning before we started?
A. No.
Q. All right. Now, you're welcome to take as much time as you want to look at this document, but what I want to ask you about it is, is there anything here in this document that sets forth your job responsibilities that you did not perform?



MR. POLLACK: I'm confused as to the question.
MR. SORENSEN: What?
MR. POLLACK: I'm confused as to the question.
MR. SORENSEN: Do you understand it, Mr. Wilson?
THE WITNESS: No. Could you restate it?
MR. SORENSEN: Is there anything that sets forth your job responsibilities in this document that you did not perform?
MR. POLLACK: You're asking, is anything of the things contained in this document that he did not perform, things that are actually written here that he did not do?
MR. SORENSEN: That is correct.
(WITNESS REVIEWS DOCUMENT)
A. On the first page at the bottom, maintain project budget. I did not do anything with money. "Manage to minimize cost associated with correcting equipment deficiencies and maintain a record of time and cost required to resolve equipment deficiencies." According to that paragraph right there with recording costs, I had nothing to do with money.



Q. So you're referring to the last item on the first page of Exhibit C?
MR. POLLACK: Document number 000009.
Q. Where it says, "Manage to minimize costs associated with correcting equipment deficiencies and maintain a record of time and cost required to resolve equipment deficiencies"?
A. Right.
Q. Are you saying you did none of that, or did you do part of it, or what?
A. I said, as far as maintaining a record of time it took to repair the equipment, yes, but as far as keeping track of costs, you know, factory money, compared to time, I never done that.
Q. Okay. Anything else?
A. And right above it, "Manage and coordinate installation technicians for maximum cost effectiveness."
Q. Yes?
A. I coordinated the technicians, tried to get some coordination when they could come in and out of the factory, but I didn't manage them. I was told that we're not looking for a manager to manage the people on site. We're looking for someone to coordinate and get along with them.

Page 106

Q. All right.
A. Towards the bottom, "Prepare a project manpower list in accord with time line and budget goals."
Q. All right. That's the third paragraph from the bottom on page 2 of Exhibit C. What about that; did you not do that at all?
A. Budget goals, I had nothing to do with financial aspects of the project.
Q. Well, as I'm reading this, and you can correct me if I'm wrong, but this doesn't say that you had anything to do with preparing the budget. It just says that you should prepare a project manpower list in accord with the budget goals that had already been established apparently by somebody else?
A. Correct. I did nothing with figures as far as what the, you know, what money I had that I had to play with and bring it within budget. I only planned time lines, time lines strictly, no money.
Q. All right.
A. First paragraph, I could not manage. I had to work in conjunction with, but do not tell nobody to do anything, and don't manage them. Just be there as an extra set of hands and help

Page 107

and keep the customer calm, so that's completely wrong.
Q. Well --
A. I tried managing on my first project, like I previously stated.
Q. Well, the first project was which one, again, Haworth?
A. Haworth.
Q. And that was in 1998, right?
A. Right.
Q. And you were told that in the future that was not to be your responsibility?
A. Not my responsibility to manage technicians, Stiles technicians or manufacture technicians. It's to supply them everything that they needed, and coordinate everything with the customer, and work in conjunction with them.
Q. And that was working with Dennis, right?
A. Correct.
Q. Well, I mean, this was in December of 2001. You weren't working with Dennis anymore at that point, right, you were working with Norbert, correct? I'll suggest to you that you moved over to Norbert's jurisdiction in June 2001; do you have any reason to disagree with that?

Page 108

A. I can't remember the dates.
Q. I'll represent to you that that was the time that you moved over to Norbert's jurisdiction, all right. Now, you notice at the bottom you signed this, Norbert signed this, it says, "I have read and discussed the above job description with the undersigned," and it includes that description you were just referring to; does it not?
A. Correct.
Q. So apparently, on a going-forward basis, at least as far as Norbert is concerned, that item you just talked about was something that was in your job responsibility, true?
A. That was something that was written on this paper, but actually physically doing it, that was a different story.
Q. I see. So you're saying that although this is written within your job responsibility, you just didn't do that?
MR. POLLACK: Objection.
MR. SORENSEN: Right?
A. I attempted to do it, but I was held back.
Q. Well, you said you attempted to do it in 1998 on the Haworth project, and you were held back there by Dennis?

Page 109

A. Correct.
Q. And apparently, going forward from 2001, you were relating back to that and said, well, I guess I'm not supposed to do that even though it's in my job description, right?
A. Correct.
Q. What else; anything that you didn't do on this list?
A. That's it.
Q. Now going back to Exhibit B, that's the letter, on the third page, after the bold print you say, "I have to realize that people will always try to smile in your face and give you the shaft, just like my good friends and cohorts, Englebert Neuss, Tim Robson, and Wolfgang Dettling from Homag"; what do you mean by that?
A. Those are manufacturing technicians that I've worked extensively with that would be on a project with me, reporting and communicating one thing, and then behind my back reporting and communicating something else.
Q. Now who -- Englebert, who did he work for?
A. Homag.
Q. And you're saying that Englebert -- what specifically are you talking about regarding

Q. Do you supervise any employees?
A. That's correct.
Q. How many?
A. About 15 or 16.
Q. Union or no?
A. Union.
Q. I want to go back to the discussion we were having about when you were first hired in at Stiles, and the question of whether you were given an option to have a straight salary or to work on a lower-based salary with overtime. I don't want to ask you any more questions about that, but my question is, after that, at any other time during the entire time you worked at Stiles, do you remember having a conversation with any of your supervisors about an option of working at a lower-based salary and receiving overtime, rather than a straight salary -- a higher straight salary with no overtime?
A. I can't remember. Most certainly, I would never have a conversation wanting less salary with overtime.
Q. Why is that?
A. Because that varies from week to week. If you get no overtime, you're stuck at 40,000, so



therefore, I'm thinking, I'm not completely sure. I can't recollect that far, but I'm thinking if there was any conversations about lowering my salary, I was against it. I can't imagine that. Overtime is not guaranteed.
Q. When you were working away from Grand Rapids, at places like Kraftmaid and Monarch, who would decide what time you'd start work every day?
THE WITNESS: Who would decide what time I would start working?
MR. SORENSEN: Yeah, yeah.
A. I would decide when I start working.
Q. And who would decide when you stopped working every day?
A. The job dictated when I stopped working every day.
Q. What do you mean by that?
A. It depends what was going on, was there a machine down, did something need to be looked at, do I have to stay 10, 12, 14 hours, is there a breakdown, is there technicians on site that needed to get into equipment and stay longer. It all varied and all depended. It also depended on the time I started work, too. Does the technician start getting in at 2, 3 or 4:00 in the morning to



talk to Germany, I got to start coming in, especially if I'm driving. There are a lot of variables.
Q. And you'd use your own discretion to determine when you start and stop, depending on what the situation was, right?
A. That's correct.
Q. And that was pretty much true throughout your tenure at Stiles, wasn't it?
A. That's incorrect.
Q. Okay. What's incorrect about that?
A. When I was at the back at the office, my boss would dictate what time I started and stopped.
Q. When you say "back at the office," you mean --
A. In Grand Rapids.
Q. In Grand Rapids. And it was in connection with that time that you'd spend in the office in Grand Rapids that you were told, look, I mean, if you're going to be coming into the office and you are a manager, you understand that you have to work at least 55 hours a week, right?
A. That's correct.
MR. SORENSEN: Okay. That's all. I don't have any more.
MR. POLLACK: I have just a couple of



questions just to clean up.

EXAMINATION BY MR. POLLACK

Q. Along with when you talked about who decided when you'd start working, what if you got a call from Monarch at 2:00 in the morning, did you have the discretion to say, I'm not coming in until 10?
A. No. I'd have to come in immediately.
Q. So when you decided when you'd come in or when you would begin your work, what do you mean by that?
A. I went back and said I decided when to come in under normal circumstances, but most of the time it was abnormal circumstances, and I had to cater either to the foreign technicians' needs, to the customers' needs, or whatever problem that arose.
Q. So if there was a call from the client, that's when you had to go in?
A. You had to get up immediately and get in there.
Q. When Paul was asking you about Kraftmaid, he was going through the technicians that were there, and you gave him a list of Stiles technicians, and then he asked you about manufacturing technicians and you just said over ten. We didn't get into the names, but were all those people there at the