**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
Roland LUTZ, Plaintiff-Appellant,
v.
AMERITECH CORPORATION, Defendant-Appellee.
**No. 98-2367.**

Feb. 23, 2000.

On Appeal from the United States District Court for the Eastern District of Michigan, Southern Division.

Before MERRITT, BOGGS, and MOORE, Circuit Judges.

MERRITT, Circuit Judge.

****1** Plaintiff seeks unpaid overtime compensation for the last four years under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. In the district court, defendant argued that the "short test" exemption of 29 U.S.C. § 213(a)(1) and 29 C.F.R. § 541.2 excused it from paying plaintiff overtime compensation by classifying plaintiff as administratively exempt. The district court agreed with defendant and finding no genuine issues as to material fact granted defendant's motion for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view facts and all inferences drawn from the facts in a light most favorable to the non-moving party, and then ask itself not whether it thinks "the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). We affirm the judgment of the district court and find that there are no genuine issues of material fact.

* * *

Plaintiff Lutz has been employed by defendant Ameritech, a telecommunications corporation, since 1977 and has worked as a field engineer since August 1, 1993. He receives a weekly salary of $1,073 .10 and is expected to work forty hours per week, but at times works more than forty hours for which he does not receive any overtime compensation. The FLSA normally requires an employer to compensate an employee who works more than forty hours per week "at a rate not less then one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a). The FLSA exempts from this requirement "any employee in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). To claim an exemption, the employer has the burden of proving that an employee is properly classified as exempt under any of these exceptions. *See* *Michigan Ass'n of Governmental Employees v. Michigan Dep't of Corrections*, 992 F.2d 82, 83 (6th Cir.1993).

Under the regulations of the FLSA, an employer demonstrates an employee is an exempt "administrative employee" by satisfying either a five-part test ("long test") specified in 29 C.F.R. § 541 .2(e)(1), or a three-part test ("short test") detailed in 29 C.F.R. § 541.2(e)(2). The short test is used when the employee at issue earns more than $250 per week. *See* 29 C.F.R. § 541.2(e)(2). Since it is undisputed that plaintiff earns more than $250 per week, the short test applies in this case. Under the short test, defendant must prove that (1) plaintiff is paid on a salary basis, (2) plaintiff's primary job duties consist of "office or non-manual work directly related to the management policies or general business operations" of defendant, and (3) plaintiff's job duties require him to "customarily and regularly exercise discretion and independent judgment." 29

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C.F.R. § 541.2(a)(1) & (e)(2); *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70-71 (6th Cir.1997). The district court found that defendant met its burden as to all three prongs.

**2 On appeal plaintiff only challenges prong two and three of the short test. First, plaintiff maintains that his job duties are manual and do not directly relate to management policies or general business operations of the defendant. To determine if plaintiff's position is manual or non-manual or directly related to management policies or general business operations of the defendant, the court looks to the primary duties of the position. 29 C.F.R. § 541.2(a). Under the regulations, 29 C.F.R. § § 541.103 and 541.206(b), an employee's primary duty is the duty of most importance to the employer, not necessarily collateral tasks that may take up more than fifty percent of the employee's time. *See also Spinden v. GS Roofing Products Co. Inc.*, 94 F.3d 421, 426-27 (8th Cir.1996); *Aaron v. City of Wichita*, 54 F.3d 652, 659 (10th Cir.1995). Although, as the district court found, plaintiff's primary duties do not relate to management policies, it did find plaintiff's job duties are directly related to the general business operations of the defendant. Relying on plaintiff's testimony from his deposition, the district court concluded that plaintiff is primarily responsible for providing access to the intra-office computer network to various groups within Ameritech. (Lutz Dep. at 9-72; J.A. at 441-56.) Defendant also showed, as evidenced by plaintiff's performance reviews, that plaintiff is a vital player in implementing new programs and solving network problems. (Def.'s Br. Resp. Pl.'s Mot. Partial Summ. J., Ex. B, D; J.A. at 287-97.) We find that the record amply supports the view that plaintiff's work is directly related to the general business operations of Ameritech.

Addressing the issue of whether plaintiff's position primarily entails manual or non-manual work, plaintiff argues that he performs manual work since he analyzes network problems with diagnostic tools and manually installs various computer equipment and software. Again considering plaintiff's deposition testimony and the undisputed deposition testimony of plaintiff's supervisor, it is clear that plaintiff's primary duty centers around designing and overseeing a plan to provide Ameritech access to the intra-office computer network. (Kinzel Dep. at 10-12; J.A. at 214-16; Lutz Dep. 9-72; J.A. at 441-56.) Deposition testimony of plaintiff's supervisor provides:

> A field engineer is expected to take client requests and consults with the client, [to] try and better define what their needs are. Once having a good understanding of what their data network needs are, [field engineers] engineer and/or design those needs and then implement them[,] so they're project manager [s], if you will, implementing solutions. They're accountable from end to end to insure that that network installation premise is up and running correctly. (Kinzel Dep. at 10; J.A. at 214.)

Based on this description and other evidence from the record, we find plaintiff's position is non-manual in nature. Plaintiff's own job description filed with his Motion for Partial Summary Judgment is in line with his supervisor's testimony. (Pl.'s Resp. Def.'s Mot., Ex. E; J.A. at 436-37.) Plaintiff cannot now argue that it was improper for the district court to rely on evidence plaintiff submitted in making its decision because the district court did not interpret the job description in the manner in which he wanted.

**3 As to the third prong of the short test, 29 C.F.R. § 541.207(a) explains discretion and independent judgment as:

> ... involv[ing] the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered... ....[T]he person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

With this explanation in mind, plaintiff contends that he simply installs, maintains, and troubleshoots the hardware and software which makes up Ameritech's intra-company network. Plaintiff argues that he relies on vendor manuals and internal documentation to perform his job duties working within pre-set guidelines created by Ameritech. In contrast, defendant contends that plaintiff's work, in practice, involves a significant amount of discretion and independent judgment for designing, planning, and implementing projects which connect Ameritech employees to its data network and for ensuring that access remains fully viable. In reviewing the parties' pleadings, briefs, attachments, and depositions, the district court found that plaintiff's own deposition testimony, job description, and performance evaluations indicated that he assesses the needs of clients, develops installation plans for access to the intra-company network, and coordinates with various departments to arrange installation and ensures that plans are implemented. We agree with the district court that plaintiff's position as a field engineer has many duties calling for independent judgement and discretion and that defendant Ameritech has met its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

burden showing that plaintiff exercises independent judgment.

We find that the record fails to show any genuine issues of material fact as to the job duties of the plaintiff; and based on the foregoing reasons, we conclude that plaintiff qualifies as an administrative employee exempt from the FLSA overtime requirements. The judgment of the district court is AFFIRMED.

208 F.3d 214 (Table), 2000 WL 245485 (6th Cir.(Mich.)) Unpublished Disposition

**Briefs and Other Related Documents** (Back to top)

• 98-2367 (Docket) (Dec. 14, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY WOLFSLAYER, Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| IKON OFFICE SOLUTIONS, INC., Defendant. | : | No. 03-6709 |

**MEMORANDUM AND ORDER**

**Schiller, J.** **January 26, 2005**

On December 12, 2003, Plaintiff Nancy Wolfslayer commenced this action against Defendant IKON Office Solutions, Inc. ("IKON"), alleging that she had been improperly classified as an exempt employee under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2003), and therefore deserved overtime pay. On November 8, 2004, this Court granted partial summary judgment in favor of Defendant ("the November 8 Order"), leaving for trial only the question of whether Plaintiff's job duties required her to be paid overtime under FLSA regulations. (Nov. 8 Order at 6-9.) On November 29 and 30, 2004, this matter was tried without a jury. The Court now enters the following Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52(a).

## I. FINDINGS OF FACT

### A. The Parties and the e-IKON Project

IKON manufactures and sells document management products, such as printers and copiers, and employs over 30,000 people in approximately 600 offices worldwide. (Pl.'s Trial Ex. 1 ¶¶ J, K.)

Plaintiff worked for IKON from January 31, 2000 until October 3, 2003. (*Id.* Ex. 28; Joint Pretrial Stip. ¶ 34.)

In the fall of 2001, IKON began an enormous initiative to streamline its operations called "e-IKON." (Joint Pretrial Stip. ¶ I.A.2, 10.) Two aspects of e-IKON are relevant to this litigation. First, IKON decided to centralize its supply chain by outsourcing its warehousing and distribution operations to "third party logistics," or "3PLs," including Exel Logistics, Inc. ("Exel"), and United Parcel Service ("UPS"). (*Id.* ¶¶ I.A.6-8.) This change meant that IKON would not own or operate warehouses to store merchandise and parts; nor would IKON actually ship merchandise to customers. (*Id.*) Instead, the 3PLs would assume those functions. (*Id.*) Second, IKON changed its software platform from older, "legacy" programs to a new, integrated platform made by Oracle. (*Id.* ¶¶ I.A.6-9.) This shift to Oracle was made simultaneously with the change to a 3PL-operated supply chain. (R. at 5-8 (Nov. 30, 2004).) The e-IKON project is still underway at the present time.[1] (Joint Pretrial Stip. ¶ I.A.10.)

**B. Plaintiff's Job Duties**

The Court will examine Plaintiff's job duties for e-IKON in two different capacities: first as a Supply Chain Business Analyst from December 2001 until August 2002; and then as a 3PL

[1] The whole of e-IKON encompasses more than these two parts. The project's other facets, though, are irrelevant to this action. Accordingly, for the sake of clarity, these Findings of Fact and Conclusions of Law will refer to the move to Oracle and the implementation of 3PL warehousing and distribution as "e-IKON."

Analyst from August 2002 until October 2003.[2] (R. at 22 (Nov. 29, 2004); Def.'s Trial Ex. 15 at D810, D2838, D0013.)

1. *Plaintiff's Duties as a Supply Chain Business Analyst*

In September 2001, Vincent Rosales approached Plaintiff and asked her to join a team he was putting together to work on outsourcing IKON's warehouse and distribution system to the 3PLs. (R. at 29 (Nov. 29, 2004).) Rosales was the Supply Chain Project Manager for the e-IKON implementation and wanted Plaintiff on his team because "she was smart." (R. at 7, 82 (Nov. 30, 2004).) Plaintiff accepted the job and began working as a Supply Chain Business Analyst in October or November of 2001. (R. at 29-31 (Nov. 29, 2004).) In this capacity, Plaintiff was the "central point of communication" between the 3PLs and the IKON employees whose jobs were to be impacted by the new way of doing business. (R. at 29 (Nov. 30, 2004); R. at 50-51, 90-91 (Nov. 29, 2004); Joint Pretrial Stip. ¶ I.A.25.) Plaintiff's role on this team was "very significant," according to Rosales, because "[i]f we didn't have the 3PLs up and running at the same time that Oracle came up, we couldn't do business." (R. at 9 (Nov. 30, 2004).)

i. Project Plans

As a Supply Chain Business Analyst, Plaintiff had numerous duties relating to the e-IKON "project plans." (R. at 37 (Nov. 29, 2004).) The 3PLs and IKON had created two separate project plans which listed all the tasks to be accomplished for the changeover from IKON-based distribution and warehousing to the 3PL-based system. (*Id.* at 38-39.) The project plans were the "biggest part of [Plaintiff's] responsibility" and occupied "around 70 percent" of her work week. (*Id.* at 39-40.)

[2] As this Court has already held that the actionable period in this litigation runs from December 12, 2001 until October 3, 2003 (Nov. 8 Order at 22), the Court will only consider the jobs Plaintiff held during that time period.

Plaintiff's first responsibility was to ensure that there were no "gaps" between the two plans, i.e., that the dates, goals, and milestones for the completion of various tasks were in sync. (R. at 17 (Nov. 30, 2004).) At trial, Plaintiff admitted that keeping the project plans up to date was "critical" to the overall project. (R. at 122 (Nov. 29, 2004).) As part of this job, Plaintiff resolved conflicts between the two plans, so that if dates on the plans did not match, then Plaintiff was responsible for bringing the discrepancies to the attention of either her supervisor, Rosales, or to the 3PL project managers. (*Id.* at 40, 91-92.) Additionally, Plaintiff "needed to ensure that these tasks were being met on time." (R. at 17 (Nov. 30, 2004).) Therefore, if Plaintiff saw that a task's due date was approaching and was not finished, she had to contact the person responsible for the task and inquire when, and whether, the task would be completed. (R. at 46-47 (Nov. 29, 2004).) Rosales testified that he "didn't know" how Plaintiff accomplished this job, because "she was a professional, she knew what she needed to do . . . . I didn't dictate that 'you have to read this task and you have to do this.'" (R. at 17 (Nov. 30, 2004).)

Beyond reconciling the plans and ensuring that due dates were met, the IKON plan also listed Plaintiff as having sole responsibility for several tasks. (Def.'s Trial Ex. 33.) For example, Plaintiff had to coordinate the distribution of new 3PL processes for various supply chain procedures to IKON employees. (*Id.* at D2754, D2758.) Because IKON was "going to do business completely different[ly]" when the 3PL supply chain began, new processes had to be written by the 3PLs and communicated to the relevant IKON employees. (R. at 18-19 (Nov. 30, 2004).) Rosales described Plaintiff as a "central point" of communication between the 3PLs and the IKON employees, responsible for making sure that the right IKON employees received appropriate information. (*Id.* at 19-20.) Plaintiff therefore had to ensure that the 3PLs were documenting their processes and that

these were made available to the proper IKON employees. (*Id.* at 19.) Before passing the new procedures on to the IKON employees, Plaintiff reviewed the 3PLs' work, so that IKON knew how the 3PLs "were going to handle our business, and to have the knowledge to communicate to the users within IKON . . . what the 3PLs were doing for us." (*Id.*)

ii. Conference Calls

During this time, in addition to her work on the project plans, Plaintiff also participated in weekly conference call meetings with UPS, Exel, and IKON representatives. (*Id.* at 41.) Plaintiff scheduled and attended these calls, and if a question arose during a call, she noted it, decided who was responsible for answering it, and placed a time limit on the answer. (*Id.* at 42-43.) Moreover, if Rosales could not attend a call, Plaintiff would run the meeting, directing what was covered and who was responsible for carrying out what was discussed. (*Id.* at 43; R. at 30 (Nov. 30, 2004).) Karen Grafje, an IKON Human Resources Business Partner, participated in several of these calls, and stated that on some calls Plaintiff was a participant, while on others, Plaintiff "actually ran the calls." (R. at 135 (Nov. 30, 2004).) This meant that Plaintiff would "walk us through what the agenda was. You know, take notes, as far as what issues were outstanding. . . . [S]he was really responsible for making sure that [the call] stayed on track, on task and identifying any issues." (*Id.*) Rosales stated that Plaintiff could prioritize tasks or give direction to participants about due dates and responsibilities, as "she was the person that was leading the meeting." (*Id.* at 32, 74.) After the call, Plaintiff raised any outstanding issues with Rosales or another supervisor. (*Id.* at 135.)

2. *Plaintiff's Duties as a 3PL Analyst*

On August 5, 2002, IKON began the "implementation" phase of e-IKON with the "Go Live" for the southeastern region. (*Id.* at 99.) Go Live referred to the date on which IKON switched over

from its "legacy" computer operations to the Oracle platform and from its own warehousing and distribution system to those of the 3PLs. (*Id.* at 99-100.) With the implementation phase approaching, IKON decided to pare its e-IKON Deployment Team from 150 workers to a 35-member "permanent Deployment Team." (*Id.* at 100.) Rosales told Plaintiff that IKON was posting job positions for the permanent Deployment Team on the company website. (R. at 53 (Nov. 29, 2004).) Rosales asked Plaintiff if she wanted to complete an online application for a job as a "3PL Analyst," and Plaintiff said yes. (*Id.* at 53-54.)

i. Plaintiff's 3PL Analyst Application

The 3PL Analyst's online Job Posting Notice stated that the 3PL Analyst must have "[k]nowledge and experience with our Oracle applications," and must "[w]ork with [3PLs] to ensure consistent implementation of IKON standard policies, processes[,] and procedures." (Def.'s Trial Ex. 15 at D0810.) Karen Grafje created the Job Posting Notice and testified that IKON was looking for "subject matter excellence" in potential 3PL Analysts, "somebody with skills and experience in logistics organization . . . [b]ecause they were going to be dealing with our third party vendors." (R. at 133 (Nov. 30, 2004).) Plaintiff wrote in her application that she was qualified for the 3PL Analyst position because "I know the processes [developed by the 3PLs to distribute IKON's products] and have been instrumental in their development and implementation." (Def.'s Trial Ex. 15 at D2838; R. at 109, 111, 113 (Nov. 29, 2004).) Moreover, Plaintiff wrote that she had "built strong relationships with both 3PL's and within the e-IKON team." (Def.'s Trial Ex. 15 at D2838.)

ii. Stabilization

Plaintiff got the job and began working as a 3PL Analyst in August of 2002. The southeastern Go Live did not go well – according to Plaintiff, "they turned the switch and everything

went wrong" – and the entire Deployment Team was assigned to an IKON "command center" in Duluth, Georgia. (R. at 62 (Nov. 29, 2004).) In Duluth, the team engaged in a six month process of "stabilization" for the southeastern region, which involved fixing problems in the Oracle software and properly reconciling the IKON and 3PL processes. (R. at 55 (Nov. 29, 2004); R. at 102-04 (Nov. 30, 2004).) Because the new software platform had trouble filling customer orders accurately and on time, Plaintiff and others assisted IKON's sales staff in getting orders filled. (R. at 102 (Nov. 30, 2004); R. at 55-60 (Nov. 29, 2004).) Plaintiff worked to both "troubleshoot what was happening with that specific" order and also to "get at . . . the root cause of why the [sales people or 3PLs] were having that problem." (R. at 102 (Nov. 30, 2004).) Rosales testified that Plaintiff answered questions about new processes and procedures posed both by IKON employees and by 3PLs. (*Id.* at 47.) He stated that "if [Plaintiff] wasn't answering questions to the 3PLs, as busy as I was, the 3PL solutions couldn't have gotten off the ground." (*Id.*)

Plaintiff contends that during this time, her job duties changed radically, and that all she did was help IKON's sales representatives fill customer orders. (R. at 55-60 (Nov. 29, 2004).) The Court finds, however, that during stabilization Plaintiff not only assisted in getting specific orders filled, but also had to identify and solve problems and answer questions regarding the Oracle software, train employees on the new software, and report problems during the conference calls that took place at the time. (R. at 31-32 (Nov. 30, 2004); R. at 60-61, 93-94, 143-46, 155-58 (Nov. 29, 2004).)

iii. Plaintiff's 2002 Annual Performance Review

In December of 2002, around the end of the stabilization of the southeastern Go Live, Plaintiff completed an Annual Performance Review. (Def.'s Trial Ex. 19 at D2831-32.) In the

Review, Plaintiff wrote that her job required "[p]roject [m]anagement [s]kills" and "analytic thinking and problem solving abilities." (*Id.* at D2831.) Plaintiff testified at trial that analytic thinking included finding discrepancies on the project plans and analyzing the differences between them by comparing differences in the spreadsheets' data. (R. at 124-25 (Nov. 29, 2004).) Plaintiff also testified that she solved problems by, for example, deciding to whom an issue had to be sent for resolution or decision. (*Id.* at 125.) Plaintiff also wrote in her Review that since her last appraisal period, one of her specific accomplishments was the "[c]reation of 3PL design processes and procedures." (Def.'s Trial Ex. 19 at D2831; R. at 129 (Nov. 29, 2004).)

iv. Plaintiff's Presentations for the Houston Go Live

By early 2003, the southeastern region had been stabilized, and Plaintiff's team began working towards the next "Go Live," which was to take place in the central region. (R. at 64 (Nov. 29, 2004).) The central region's headquarters is in Houston, Texas, and Plaintiff worked out of Houston from January 2003 until June or July of 2003. (*Id.* at 63.) Because the southeastern Go Live had encountered so many problems, IKON decided to distribute more information to various groups of IKON employees before the central Go Live. (*Id.* at 70.) As part of this information distribution, Plaintiff developed, created, and gave presentations to IKON's sales representatives concerning how UPS was going to handle IKON's orders. (*Id.* at 70-71, 94; R. at 24 (Nov. 30, 2004).) To make these presentations, Plaintiff culled information from various other presentations that had previously been given, selected what she felt was important, and put that information in her presentations. (R. at 70-71 (Nov. 29, 2004).) As part of her presentations, moreover, Plaintiff answered questions from her audience. (*Id.* at 71-72.)

v. Plaintiff's Dashboard Reports

In March of 2003, Plaintiff began completing weekly status reports, or "dashboard reports," on an online program. (Def.'s Trial Ex. 32 at D0048-65; R. at 138 (Nov. 29, 2004).) In these reports, Plaintiff described what her she and her contacts at the 3PLs had accomplished that week, and what would be done in the upcoming week. (R. at 139 (Nov. 29, 2004).) For example, Plaintiff stated that she had been the "chair of daily implementation calls with the 3PLs," that she had engaged in "management and issue resolution for Supply Returns and Inventory Transfers," and that she had done "Supply Chain stabilization support - teaching; answering questions, solving issues." (Def.'s Trial Ex. 32 at D0054-56.) According to her reports, Plaintiff also conducted various analyses, including an "analysis of [emergency order] shipments," and an analysis of "shipment costs for fax/segment 1 machines nationwide." (*Id.* at D0058, D0060.)

vi. Houston Go Live

The Houston Go Live occurred on May 19, 2003. (R. at 150 (Nov. 29, 2004).) Immediately after this Go Live, during the "stabilization" for the central region, Plaintiff worked with UPS to design and implement a solution for "return material authorization." (*Id.* at 97-99.) Apparently, immediately after the Go Live date, there was a large problem with the process for authorizing and processing products that customers had returned. (*Id.*) Rosales sent Plaintiff to a UPS warehouse in Houston for two weeks "to dig down and find out what the issue was." (R. at 40 (Nov. 30, 2004).) Rosales "put [Plaintiff] in charge of making sure that process was fixed . . . . She led that effort." (*Id.* at 40-41.) Plaintiff's dashboard report for the week of May 17-23, 2003 reflected this task: she wrote that one of her "Key Activities Planned" was the "one-on-one monitoring of the returns

process . . . to make sure that the process is understood correctly and is running smooth." (Def.'s Trial Ex. 32 at D0054.)

vii. Plaintiff Seeks Another Job

In July of 2003, after the central region had been stabilized, IKON stopped the implementation of e-IKON for a period of time. (R. at 64 (Nov. 29, 2004).) At that point, Plaintiff had "nothing to do," and so began looking for another job. (*Id.* at 64, 76.) As part of her job search, Plaintiff created a new resume. (*Id.* at 76.) According to Plaintiff, she "created a couple of resumes that I was playing with, a lot of it based on responsibilities that I really wished I had . . . and I guess you could say they were fantasy resumes so to speak." (*Id.*) Plaintiff testified that these "wish" resumes did not accurately represent her job duties. (*Id.* at 77.)

Nevertheless, Plaintiff sent out these "wish" resumes, and *only* these resumes, to all the jobs for which she applied. (*See* Def.'s Trial Ex. 23 at 5 (May 29, 2003 email to Tyler Search Consultants with message "Please accept this resume for review."), 6 (June 24, 2003 email to AmerisourceBergen); Def.'s Trial Ex. 24 at 1 (June 3, 2003 email to Adolor Corporation, stating, "as you can see from my attached resume, I have . . . gained enormously in Supply Chain experience"), 7 (June 5, 2003 email to Prescient Systems).) Moreover, Defendants asked Plaintiff for any copies of her "accurate" resume during discovery in this action, but Plaintiff could not produce any such copies. (R. at 169-70 (Nov. 29, 2004).)

On her "I wish" resume, Plaintiff described herself as a "Supply Chain Management Professional with an in-depth understanding of business technologies, trends, business models and processes." (Def.'s Trial Ex. 25 at 2.) Moreover, Plaintiff wrote that she possessed "[e]xceptional relationship and management skills with internal and external clients as well as Third Party

partners." (*Id.*) She stated that she had experience in "Customer Relationship Management," "Business Process Mapping, Redesign and Automation," "contracts, design and implementation across a global supply chain," and "Project Management." (*Id.*) She described her job in the time period at issue as "Redesign and Implementation of a $500 million global warehouse and distribution network for a Fortune 300 Company." (*Id.*)

Plaintiff was laid off from IKON in October 2003. (*Id.* at 81.) Plaintiff was subsequently offered another job at IKON, but chose not to take it because of the impact that her job-related travel was having on her health and family life. (*Id.* at 82.)

## II. CONCLUSIONS OF LAW

### A. The FLSA

FLSA generally requires employers to pay employees overtime when they work more than forty hours per week. 29 U.S.C. § 207(a)(1) (2003). "Administrative" employees, however, are exempt from these overtime pay provisions. *Id.* § 213(a)(1) (stating that overtime is not required for those "employed in a bona fide . . . administrative . . . capacity"). The Secretary of Labor ("the Secretary") has issued regulations that define and interpret "bona fide administrative capacity." *Id.* §§ 541.2, 541.201-215. These regulations have the binding effect of law. *See Auer v. Robbins*, 519 U.S. 452, 458 (1997) (holding that FLSA grants Secretary broad authority to define and delimit scope of FLSA exemptions); *see generally Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (holding that regulations issued by administrative agency pursuant to grant of statutory authority have force and effect of law).

FLSA exemptions are narrowly construed and the employer has the burden to show that its employees are exempt from FLSA's overtime requirements. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974); *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 183 (3d Cir. 1988). Moreover, "if the record is unclear as to some exemption requirement, the employer will be held not to have satisfied its burden." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991) (*citing Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966)).

To show that an employee is an exempt "administrative employee," an employer must demonstrate that an employee who earns at least $250.00 per week[3] meets both a "duties" test and a "salary basis" test. 29 C.F.R. § 541.2(e)(2) (2003). On summary judgment, this Court held that IKON's compensation scheme met the salary basis test. (Nov. 8 Order at 18.) The Court now holds that Plaintiff is not entitled to overtime pay because Defendant has carried its second burden and shown that Plaintiff's duties comported with the FLSA's definition of an "administrative" employee.

**B. The Duties Test**

The duties test examines the actual tasks that an employee performs, as only certain job duties permit an employer to avoid payment of overtime. 29 C.F.R. § 541.2. The duties test consists of two prongs, both of which must be met by the employer. *Cooper Elec.*, 940 F.2d at 901. First, an employee must be paid overtime unless the employer can show that the employee's primary duty

[3] The Secretary has issued both "long" and "short" tests of bona fide administrative employee status. *See* 29 C.F.R. § 541.2(a)-(e) ("long" test); 29 C.F.R. §§ 541.2(e), 541.214 ("short" test). The short test applies to so-called "high salaried" employees, earning over $250 per week. 29 C.F.R. § 541.2(e). Here, the parties agree that, at all relevant times, Plaintiff earned at least $250.00 per week. (Joint Pretrial Stip. ¶¶ I.A.12-15.) Therefore, the "short" test applies.

at work directly relates to the employer's management policies or general business operations. *Id.* at 901; *see also* 29 C.F.R. § 541.2(e)(2). The court's inquiry under the first prong subsumes two subsidiary questions: (a) whether an employee is a "production" rather than an "administrative" worker; and (b) whether the employee's work is of "substantial importance" to the employer. *Cooper Elec.*, 940 F.2d at 902. Only non-production workers whose jobs are substantially important may be exempt. Second, the worker must be paid overtime unless the employer shows that the employee's primary duty includes work requiring the exercise of "discretion and judgment." *Id.* at 901; *see also* 29 C.F.R. § 541.2(e)(2). The Third Circuit has cautioned that "[t]hese inquiries are fact intensive." *Cooper Elec.*, 940 F.2d at 901.

*1. General Business Operations*

The Court must first determine the appropriate time frame by which to measure Plaintiff's "primary duty," "based on all the facts in [this] particular case." 29 C.F.R. §§ 541.103, 541.2(a), 541.206. The Secretary's regulations provide that "a good rule of thumb [is] that primary duty means the major part, or over 50 percent, of the employee's time." *Id.* § 541.103. Moreover, "the regulation appears aimed at a holistic approach to primary duty." *Marshall v. W. Union Tel. Co.*, 621 F.2d 1246, 1252 (3d Cir. 1980). Accordingly, this Court will examine Plaintiff's duties during the entire actionable period and evaluate whether, as a whole, over 50% of Plaintiff's time was spent on administrative duties as defined by the regulations.

a. Administration/Production

The first part of the duties test's first prong is the "production/administration" dichotomy: employees who do "production" work are covered by FLSA, while "administrative" employees may be exempt. *See Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 517 (6th Cir. 2004); *see also Cooper*

*Elec.*, 940 F.2d at 901-02. An employee is engaged in administrative work when the employee "'services' his employer's business," which "denotes employment activity *ancillary* to an employer's principal production activity." *Cooper Elec.*, 940 F.2d at 903 (emphasis in original). However, the "administrative/productive work dichotomy is not to be understood as covering only work involving the manufacture of tangibles." *Id.* Instead, when determining whether an employee is engaged in production work, "it is important to consider the nature of the employer's business." *Id.* For example, if a company's business is selling products, then a production worker may "produce sales"; in other words, the term production "is not limited to manufacturing activities." *Id.* at 903. Thus, "non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997).

After examining Plaintiff's duties from December 12, 2001 until October 3, 2003, the Court holds that Plaintiff's primary duty was the performance of administrative, as opposed to production, work at IKON. First, for the period from December 2001 until August 2002, Plaintiff testified that she spent 70% of her time on project plan-related work. (R. at 39-40 (Nov. 29, 2004).) This work did not "generate . . . the very product or service" that IKON "offers to the public," *John Alden Life*, 126 F.3d at 9, which is the manufacture and sale of document management products (Pl.'s Trial Ex. 1 ¶¶ G, H, I). Instead, Plaintiff helped administer the implementation of a change to IKON's back room operation – the method by which IKON warehoused and shipped its products. Plaintiff's job certainly had nothing to do with the actual manufacture of printers and/or copiers. Similarly, Plaintiff's work during this period did not "produce sales" for IKON. *See Cooper Elec.*, 940 F.2d at 901-02. She, instead, was the interface between IKON service providers (the 3PLs) and various

kinds of IKON employees. (R. at 19-21 (Nov. 30, 2004).) As such, Plaintiff's primary duty included advising management, planning, and representing the company to the 3PLs, tasks which are explicitly included in the definition of administrative operations. *See* 29 C.F.R. § 541.205(b) (stating that "administrative operations of the business include work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.")

Other duties performed by Plaintiff, in furtherance of her primary duty of helping to administer e-IKON, also demonstrate the administrative nature of her work. Plaintiff advised IKON's management when, after running a conference call meeting, she raised the outstanding issues with Rosales or another manager. (R. at 41-43, 135 (Nov. 30, 2004).) Plaintiff represented IKON in her dealings with the 3PLs, as Plaintiff herself stated in her 3PL Analyst application and an application she completed for the position of Director of 3PL Operations. (*See* Def.'s Trial Ex. 15 at D2838 (stating "I have built strong relationships with [] 3PLs"); Def.'s Trial Ex. 20 at D2841 (stating "I have been deeply involved in partnership development" with 3PLs)).

Plaintiff contends, however, that during the six month "stabilization" period after the southeastern Go Live (from August 2002 until January 2003), her most important function became assisting IKON sales representatives fill customer orders. Plaintiff argues that her primary duty during this time was therefore "production" related. Yet the evidence adduced at trial indicates that Plaintiff's primary duty during this period remained acting as a focal point for the communication between the IKON users and the 3PL employees. (R. at 47, 102-04 (Nov. 30, 2004).) Moreover, beyond "helping orders get filled," Plaintiff's role also included determining "the root cause of why"

a problem was occurring by mediating between IKON's information technology department and the employees at 3PL warehouses. (*Id.* at 102.) This type of function is clearly within the ambit of "activities relating to the administrative operations of a business." 29 C.F.R. § 541.205. Again, the proper inquiry is the scope of the employee's "primary duty." *Id.* at § 541.2(a). Even during the six month stabilization period, Plaintiff's "primary duty" was to work on implementing e-IKON and thereby to assist in streamlining the structure and organization of IKON's business. *See, e.g., Cooper* 940 F.2d at 904-05. Any assistance she provided to IKON's sales representatives during this time was "incidental" to this primary duty.[4] *Id.*

b. Substantial Importance to Employer

The second part of the duties test's first prong permits "only employees whose work substantially affects the *structure* of an employer's business operations and management policies [to] be characterized as administrative workers" and thus exempt from FLSA. *Cooper Elec.*, 940 F.2d

[4] Even assuming *arguendo* that Plaintiff spent the majority of her time during the six month "stabilization" period assisting sales representatives fill customer orders, her argument that this makes her a "production" worker would nevertheless fail for two reasons. First, it is true that "production" is not limited to so-called "blue-collar" workers, and that where a business is engaged primarily in "producing sales," a sales person can be a "production" employee for FLSA purposes. *See Cooper Elec.*, 940 F.2d at 903 (sales representatives are non-exempt production employees); *see also Gusdonovich v. Bus. Info. Co.*, 705 F. Supp. 262, 265 (W.D. Pa. 1985) (where business "produces information," and plaintiff gathered that product, plaintiff was production worker). Here, however, Plaintiff never contends that even for the disputed six month period, she actually acted as an inside sales person. Instead, she claims only that she assisted those sales. This is at least one step further removed from sales-based production work as the case law has defined that term.

Second, an employee's "primary duty" is to be examined using a "holistic approach." *W. Union Tel. Co.*, 621 F.2d at 1252. Here, Plaintiff contends that her primary duty was production oriented for only six months of a two year period. Accordingly, even if Plaintiff's primary duty had shifted from administration to production for the six months of the southeastern stabilization, she would still not be a production employee because her remaining eighteen months of work were predominantly spent on administrative duties.

at 906 (emphasis in original). It is undisputed that e-IKON was an enormous project, of huge significance to IKON's business. (Joint Pretrial Stip. ¶ I.A.9.) In fact, while Plaintiff worked at IKON the Oracle aspect alone cost over $110 million and was one of the three largest Oracle installations occurring in the country. (R. at 96 (Nov. 30, 2004).) As *Cooper Electric* makes clear, though, the overall importance of the project to Defendant's business does not mean that Plaintiff's work in particular was substantially important. *See Cooper Elec.*, 940 F.2d at 906 (noting substantial importance "must be addressed in terms of the consequences of each employee's efforts alone, not the effect of [similarly situated employees] as a group").

The governing regulations explain that work of "substantial importance to the management or operation of the business" is not limited to those who formulate management policies. 29 C.F.R. § 541.205. Instead, work can be directly related to management policies or general business operations if performed by employees whose "work affects policy or whose responsibility is to execute or carry it out." *Id.* The regulations also state that "it is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operations of a business." *Id.*

This Court holds that Defendant has carried its burden and shown that Plaintiff's work was substantially important to the overall implementation of e-IKON. Plaintiff herself described her work with the project plans as "critical" to the overall project. (R. at 122 (Nov. 29, 2004).) Next, Plaintiff's direct supervisor, Rosales, stated that Plaintiff's role on his team was "very significant" because she was a "central point of communication" between various groups working on the e-IKON project. (R. at 9, 29 (Nov. 30, 2004).) In fact, Rosales testified that, during the period of

stabilization, if Plaintiff had not been answering questions posed to her by 3PLs "the 3PL solutions couldn't have gotten off the ground." (*Id.* at 47.)

Moreover, on her July 11, 2002 application for the 3PL Analyst job, Plaintiff wrote that she knew the processes developed by 3PLs to distribute IKON's products and had been "instrumental in their development and implementation." (Def.'s Trial Ex. 15 at 2838.) Plaintiff's "wish" resumes went even further, claiming that she engaged in "customer relationship management" and "project management," and performed the "Redesign and Implementation of a $500 million global warehouse and distribution network for a Fortune 300 Company." (Def.'s Trial Ex. 25 at 2.) Courts have recognized that such statements must be taken with a grain of salt. *See, e.g., Ale v. TVA*, 269 F.3d 680, 689 n.2 (6th Cir. 2001) (noting that "resumes may not provide the most accurate picture of an employee's job because resumes are typically designed to enhance the employee's duties and responsibilities in order to obtaina job"). Therefore, Plaintiff's statements on her 3PL job application and her "wish" resumes may have exaggerated her own importance. However, Plaintiff also sent an email to a personal friend as she was applying to become the Director of 3PL Operations which plainly indicates her belief that her actual, day-to-day job duties were substantially important to e-IKON. (Def.'s Trial Ex. 21 at 2.) In that email, dated March 25, 2003, Plaintiff wrote that she did not think she would get the Director position, "but since I've been doing the [Director] job for the last year, I feel I have to try." (*Id.*)

2. *Exercise of Discretion*

Finally, to be an exempt administrative employee, an employee must exercise discretion and independent judgment. 29 C.F.R. § 541.207. This determination "must be applied in the light of all the facts involved in the particular employment situation in which the question arises." *Id.* at §

541.207(b). Discretion and independent judgment involve comparing and evaluating possible courses of conduct and making an independent choice, free from immediate direction or supervision. *Id.* at § 541.207(a). At least some of this discretion and judgment must be "with respect to matters of significance." *Id.* Under the short test, an employee may be exempt if her job merely "includes work" requiring discretion and independent judgment; that employee does not have to "customarily and regularly" exercise discretion and independent judgment, as she wouldunder the "long test." *See, e.g., Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 627 (11th Cir. 2004); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1002 (8th Cir. 2003); *O'Dell v. Alyeska Pipeline Serv. Co.*, 856 F.2d 1452, 1454 (9th Cir. 1988); *Donovan v. United Video, Inc.*, 725 F.2d 577, 581 n.4 (10th Cir. 1984).

This Court holds that Defendant has carried its final burden and affirmatively shown that Plaintiff's primary duty included the exercise of discretion and independent judgment. First, Plaintiff's work on the project plans required the exercise of discretion. If, after examining the different plans, Plaintiff saw that a task with an impending due date had not been finished, she had the authority to call the responsible party and ask when and whether the task would be completed. (R. at 46-47 (Nov. 29, 2004); R. at 17-19 (Nov. 30, 2004).) Rosales, Plaintiff's supervisor, said that he "didn't know" how she did this job, because "she was a professional, she knew what to do . . . . I didn't dictate [what to do]." (R. at 46-47 (Nov. 29, 2004); R. at 17 (Nov. 30, 2004).) Plaintiff herself stated at trial that she solved problems regarding the plans by deciding who could best resolve or decide the issue. (R. at 125 (Nov. 29, 2004).) Next, Plaintiff "ran" numerous conference calls with 3PLs and IKON employees during the planning and implementation of e-IKON. (R. at 43 (Nov. 29, 2004); R. at 30, 32, 74, 135 (Nov. 30, 2004).) Plaintiff had the authority to decide the

relative priority of tasks discussed during the call, and could give direction to call participants about due dates and responsibilities. (R. at 32, 74 (Nov. 30, 2004).) This kind of discretion comports closely with an example of acceptable discretion and independent judgment found in the regulations. *See* 29 C.F.R. § 541.207(d)(2) (stating that discretion is exercised by employee "who without specific instructions or prescribed procedures, arranges interviews and meetings, and handles callers and meetings himself where the executive's personal attention is not required").

Plaintiff also exercised discretion and independent judgment when she developed and made presentations to IKON's sales representatives before the Houston Go Live. (R. at 64-72 (Nov. 29, 2004); R. at 24 (Nov. 30, 2004).) In developing the presentation, Plaintiff examined material from previous presentations and selected and arranged the information she thought was relevant for her purposes. (R. at 70-71 (Nov. 29, 2004).) Plaintiff answered questions after her presentations without direct instruction from supervisors. (*Id.*) Finally, after the Houston Go Live, Rosales sent Plaintiff to a UPS warehouse in Houston for two weeks to solve a problem with the process for authorizing returned material. (R. at 97-99 (Nov. 29, 2004); R. at 40-41 (Nov. 30, 2004).) Rosales stated that Plaintiff was "in charge of making sure that process was fixed . . . . She led that effort." (R. at 40-41 (Nov. 30, 2004).) As part of this effort Plaintiff identified problems and determined the person who could find a solution. (*Id.* at 42.) She could then either call a meeting or "she would call [that employee] one-on-one and say, 'this needs to happen, or this isn't happening. We need to fix this.'" (*Id.*) Rosales testified that Plaintiff had the authority to give direction to these employees in pursuit of a solution to the problems. (*Id.* at 42-43.) In sum, Plaintiff often exercised discretion and independent judgment while engaged in her job duties on the e-IKON project.

## III. CONCLUSION

For the reasons set forth above, the Court holds that Defendant has met its burden and affirmatively demonstrated that Plaintiff was properly classified as exempt from the overtime pay provisions of FLSA. Accordingly, Plaintiff's claim for overtime pay is denied.[5] An appropriate Order follows.

---

[5] Plaintiff has also asserted a claim pursuant to the Pennsylvania Wage Payment and Collection Law, 43 PA. CONS. STAT. ANN. §§ 260.1-260.12 (2004) ("WPCL"). The WPCL provides employees with a statutory remedy to recover wages and other benefits that are contractually due to them. *Oberneder v. Link Computer Corp.*, 696 A.2d 148, 150 (Pa. 1997). "The purpose of the WPCL is to allow employees to recover wages and other benefits that are due from employers pursuant to agreements between the parties." *Killian v. McCulloch*, 850 F. Supp. 1239, 1255 (E.D. Pa. 1994). However, the WCPL "itself does not create a right to compensation. Rather, it gives additional protections to employees by providing statutory remedies for the employer's breach of its contractual obligation to pay wages." *Sendi v. NCR Comten, Inc.*, 619 F. Supp. 1577, 1579 (E.D. Pa. 1985). Plaintiff concedes that her employment agreement with Defendant did not require Defendant to pay her overtime compensation. (Pl.'s Am. Concl. of Law ¶ 59.) Because Plaintiff has failed on her FLSA claim, she cannot use the WPCL as a vehicle to collect overtime pay, as none is due to her.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NANCY WOLFSLAYER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **IKON OFFICE SOLUTIONS, INC.,** | : | **No. 03-6709** |
| **Defendant.** | : | |

**ORDER**

**AND NOW**, this **26th** day of **January, 2005**, upon consideration of the parties' Amended Findings of Fact and Conclusions of Law, following a bench trial on the merits, and for the foregoing reasons, it is hereby **ORDERED** that:

1. Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's claim pursuant to the Fair Labor Standards Act.
2. Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's claim pursuant to the Pennsylvania Wage Payment and Collection Law.
3. Each party is directed to bear its own costs.
4. The clerk of Court is directed to close this case.

**BY THE COURT:**

______________________________

**Berle M. Schiller, J.**