ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

---------------------------------------------------------------x

FURGUS WILSON, :

Plaintiff, :

-against- : Case No: 05-CV-324WES

STILES MACHINERY, INC., :

Defendant. :

---------------------------------------------------------------x

**PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. Defendant Stiles Machinery, Inc. is a distributor of woodworking and panel-processing machinery and equipment. Stiles sells machinery, software, and production equipment for a wide variety of woodworking application. (Deposition of Chuck Van Loon at 18-19.) *Undisputed - Stiles is "a dealership representing panel processing equipment . . . selling the equipment . . . servicing the equipment we install, selling parts . . .." Van Loon Tr. at 19:1-7.*

2. Plaintiff, Fergus (sic) Wilson, was hired by Stiles in 1997 as a project manager. Complaint ¶ 11. *Disputed - Although he was hired as a project manager, as of May 9, 2003, "according to Mr. Van Loon [Stiles' Service Manager] and [Norbert] Gorgas [the National Service Manager], Furgus' correct title should be 'Service Account Representative.'" Stiles Doc. No. 000002. (Attached as Exhibit G to the Declaration of Jeffrey D. Pollack ("Pollack Decl."). See also Wilson Tr. at 130:14-21 (Gorgas changed Wilson's title to "assembly supervisor" or "on-site install coordinator"); infra ¶¶ 8, 11, 13, &14.*

3. Stiles employed Wilson until 2004, when Wilson quit his job. (Wilson Deposition Exhibit 2.) *Undisputed*

4. From approximately June 2001 until November 2003, Wilson worked as a project manager at a client site (Kraftmaid) in Ohio. Complaint ¶ 9. *Disputed – See supra ¶ 2.*

5. From approximately November 2003 until October 2004, Wilson worked as a project manager at a client site (Monarch) in Rhode Island. Complaint ¶ 8. *Disputed - See supra ¶ 2.*

6. While at Stiles, Wilson was paid an annual salary that fluctuated between $73,000 and $76,000. (Affidavit of Larry Hart at ¶ 5.) *Undisputed - Wilson also received*

*commissions ranging from $615 in 2001 to $9,217.66 in 2003. He did not receive any commission in 2004. May 5, 2006 letter from Paul Sorenson to Jeffrey Pollack attached as Exhibit I to the Pollack Decl.*[1]

7. During his entire career at Stiles, Wilson's job title was Project Manager. (Deposition of Fergus (sic) Wilson at 22.) *Disputed - See supra ¶ 2.*

8. Wilson's duties were laid out in his job description (which he signed, agreeing that he both read and discussed the description with his supervisor). (Wilson Deposition Exhibit 1.) *Disputed - a) The amount of manual labor Wilson performed, including installing and servicing machines sold by defendant, increased during the last four years of his employment. Wilson Tr. at 23:6-24:17; 25:4-5; 26:3-7; 85:22-87:14.*[2]

*b) From 2001 to the time of his resignation, Wilson spent approximately seventy percent (70%) of his time performing manual labor. Wilson Decl. ¶ 5.*[3]

*c) Volkmar Ege, Stiles' National Technical Support Specialist, testified that Wilson performed manual labor seventy percent (70%) of the time Ege was at Monarch. Ege Tr. at 24:9-25:10. See also id. at 26:7-11. Ege also testified that there were times at Kraftmaid that eighty percent (80%) of the time Ege was there Wilson performed manual labor. Id. at 20:3-21. See generally id. at 16:10-18:2; 19:9-19.*

*d) Wilson was responsible for performing PMs (preventive maintenance) at Kraftmaid, which included inspecting the machines, replacing parts, and making adjustments. Van Loon Tr. at 44:22-45:21.*

---

[1] Stiles also paid Wilson's rent for a period of time, totaling $18,744, which would be included in his regular rate. *Id. See* 29 C.F.R. §§778.217(d); 778.224(a).

[2] Wilson spent so much time performing manual labor that he had his own set of tools at the job site. Wilson Tr. at 60:17-21; 62:25-63:4.

[3] Defense counsel did not ask Wilson to quantify the amount of manual labor he performed.

*e) Wilson did not perform some of the duties listed on his job description. For example, he did not do anything related to finances. Wilson Tr. at 104:18-105:14; 106:8-20. He did not supervise or manage any employees. Wilson Tr. at 105:20-25; 106:22-107:17. He did not participate in the hiring, firing, or disciplining of any employees. Wilson Decl. ¶ 9. Nor did he prepare project manpower lists. Wilson Tr. at 106:2-4.*

9. The job description provided that Wilson was responsible for management of project installations and follow-up to achieve maximum customer satisfaction; maintaining good customer relations; managing contractual agreements; coordinating installation technicians; supporting the objectives of Stiles; and giving monthly progress reports to the National Service Manager. Id. *Undisputed as to the contents of the job description. Disputed that the job description accurately reflects the duties Wilson performed. See supra ¶ 8; infra ¶¶ 11, 13, 14 & 29.*

10. At his deposition, Wilson did not dispute that these were his job duties. (Wilson Dep. at 104-109.) *Disputed – See supra ¶ 8; infra ¶¶ 11, 13 & 14..*

11. In Wilson's letter of resignation, he stated that, while at Stiles, he did the work of a Project Manager. (Wilson Dep. Exhibit 2.) *Undisputed that the letter contains this statement, but it is quoted out of context. The letter also states that Wilson "also had to do the work of a technician" (id. at 1), that he was told he had to "start wrenching" (id. at 2), and that he "was a genuine 'gopher' and <u>doing the job of an average technician for Stiles instead of the project manager duties for which I was hired</u>." (Id. at 3)(emphasis supplied).*

12. Wilson has also stated "[m]anaging multi-million dollar projects at various customer sites is my main job function." (Wilson Dep. Exhibit 3.) *Undisputed that Wilson's resume contains such a statement. Disputed that the statement was accurate, as opposed to fluff designed to get him a better job. See supra ¶¶ 8, 11, 13,14, & 29.*

13. Wilson would manage and oversee the installation of multiple machine lines at customer sites, act as Stiles front-line point of contact with the customer, and deal with any problems that might come up. (Affidavit of Larry Hart at ¶ 9.) *Disputed –*

*a) Don LeBlanc, Stiles' Manager of Special Projects, had meetings at Kraftmaid at least twice per month, but Wilson's role was simply to "report as to how things were going" or to "give an update." LeBlanc Tr. at 12:16-13:12; 17:20-18:1.*

*b) Wilson addressed problems with customer's machines by operating the equipment to produce samples, measuring the samples, and then making electrical and mechanical adjustments to the machine. Wilson Decl. ¶ 7. See generally Wilson Tr. at 73:6-74:20.*

*c) During Wilson's time at Monarch, where the customer was often dissatisfied, most of the meetings to address the customer's dissatisfaction were between Monarch's employees and Stiles' sales people; Wilson only attended one such meeting. Wilson Tr. at 68:25-70:14. See also LeBlanc Tr. at 41:5-25 (LeBlanc spent one and one-half hours on phone with Monarch trying to appease customer; Wilson did not participate).*

*d) LeBlanc testified that his own "primary responsibility was to manage the project from a global perspective . . . that everything was going according to our plan*

*and that everything was being correctly implemented on the shop floor and the customer was satisfied." LeBlanc Tr. at 20:9-16.*

*e) Van Loon's responsibilities as service manager are to "manage the customers . . ., oversee the installation of new equipment, warranty service calls, servicing calls in general, overseeing . . . the scheduling of my people." Van Loon Tr. at 16:20-25.*

*f) According to Van Loon, Wilson's responsibilities included updating parts lists, reviewing stock room inventory, ordering parts, and selling "recommended maintenance programs." Van Loon Tr. at 59:1-4; 76:17-77:3.*

*g) LeBlanc testified that Stiles "sold [Wilson's] services." LeBlanc Tr. at 19:16-18.*

14. Wilson routinely reported back to Stiles regarding these problems and the overall status of the project. (Wilson Dep. at 53.) *Undisputed*

*a) Wilson communicated with his supervisors by email at least once each week, and via telephone at least several times per week. Wilson Decl. ¶ 6.*

*b) The "open items" lists that Wilson prepared for his supervisors merely expressed the customer's dismay; they did not involve the exercise of discretion or independent judgment by Wilson. Wilson Tr. at 68:8-16. Wilson merely reiterated what the customer wanted. See generally Wilson Tr. at 55:10-58:4. For example, the customer told Wilson that they wanted to run one size panel; Wilson did not recommend that course of action. Wilson Decl. ¶ 10. Cf. Wilson Tr. at 55:10-56:16.*

15. Wilson would spend months (or sometimes even more than a year) at a particular customer's site to manage proper installation and performance of Stile's products.

(Wilson dep. at 87.) *Undisputed that he would spend significant amounts of time at clients. Disputed that he spent such time "managing." See supra ¶¶ 8 & 11; infra ¶ 29.*

16. Wilson was responsible for developing, coordinating, and implementing an installation timeline with input from the customer, Stiles' sales engineers, relevant product mangers, and service management. (Wilson Dep. at 106.) *Disputed – Wilson planned time lines; he did not testify how he did that. Wilson Tr. at 106:17-107:2.*

17. Wilson also developed a basic plan for executing and controlling the project, including establishment of a chain of command. (Wilson Dep. 104-109; Dep. Exhibit 1.) *Disputed – The cited testimony does not support this assertion.*

18. This plan would include manpower lists that reconciled with the installation timeline. (Wilson Dep. at 104-109; Dep. Exhibit 1.) *Disputed - See supra ¶ 8(e),.*

19. Wilson's installation duties also included studying contract documents to understand the equipment and relevant contractual obligations. (Wilson Dep. at 104-109; Dep. Exhibit 1.) *Disputed – The cited testimony does not support this assertion.*

20. Wilson coordinated a team of service technicians that was tasked to solve problems during the installation process and initial operating period of the equipment (Wilson Dep. at 28-29.) *Disputed – Wilson "tried to get some coordination when they [the technicians] could come in and out . . . but I did not manage them. I was told that we're not looking for a manager to manage the people on site." Wilson Tr. at 105:20-24. See also id. at 107:13-17.*

21. Wilson was responsible for reviewing the personnel requirements and moving personnel in or out of the project as necessary. (Wilson Dep. at 105; Dep. Exhibit 1.) *Disputed – See supra ¶ 20.*

22. Wilson stated that he was responsible for supervising technicians in his work experience as Project Manager for Stiles. (Dep. Exhibit 3.) *Disputed – Wilson did not supervise or manage any employees. See supra ¶¶ 8(e)& 20.*

23. While on-site, Plaintiff was the primary contact between the customer, Stiles, and the installation personnel. (Wilson Dep. at 104-109.) *Disputed - The cited testimony does not support this assertion. See supra ¶ 14.*

24. Wilson was in charge of customer support at Monarch and Kraftmaid. (Affidavit of Larry Hart at ¶ 12; Affidavit of Chuck Van Loon at ¶ 11.) *Disputed - See supra ¶ 14.*

25. In his role, Plaintiff coordinated project meetings with the customer. (Wilson Dep. at 104-109.) At these meetings, Wilson acted as a Stiles management representative and kept the customer informed of his responsibilities, installation schedule and whatever additional information could be useful to maintain a positive and proactive customer relationship (Wilson Dep. at 104-109; Van Loon Dep. at 34.) *Disputed - The cited testimony does not support this assertion. See supra ¶ 14.*

26. Plaintiff was paid a salary for all hours worked. Complaint ¶ 6. *Undisputed - Wilson's salary was intended to cover a 55-hour workweek. Wilson "understood when [he] started at Stiles that [he] was being compensated for 55 hours." Wilson Tr. at 75:16-17. Wilson had conversations with his manager, Dennis Stevens, and with Stile's Human Resource manager, Darci Buelow (n/k/a Darci Corner), who both told him he was employed for a 55-hour week. Wilson Tr. at 75:12-76:7; 81:2-25; 117:3-25.*

27. Plaintiff was paid as an exempt employee under the FLSA. Complaint ¶ 11. *Undisputed - Stiles hired Wilson in 1997 supposedly as a project manager, classified him*

*as an exempt employee, and paid him a salary with no compensation for overtime hours. Wilson Decl. ¶ 3.*

28. Stiles is an "employer" under the FLSA. Complaint ¶ 7. *Undisputed*

<u>Plaintiff's Statement of Additional Undisputed Material Facts</u>

29. Wilson completed and submitted reports to defendant on a weekly basis throughout the course of his employment that detailed the work he was performing, such as:

- Installed Bst-500 machines . . . assisted Uwe on the Homag machines. Picked up Homag tech at airport, drove marc (sic) to airport . . ..
- Installed Black Brothers Press. Took all machines off skids . . . measured zero lines, aligned equipment, connected pneumatics.
- Helped Brett Silva lay out lines, move equipment, uncrate machines off skids, drove forklift, helped install turntable, installed Liftomats and conveyors.
- Installed Homag KF machines . . . Picked up German techs from airport and drove them to work.
- Offloaded Black [B]rothers press and Homag 9800 single sided machine.
- Installed Homag KF machine on bases, leveled bases, snapped zero line, drilled all holes in floor for anchors, coarse alignment on both machines.

(A series of these reports is attached as Exhibit F to the Pollack Decl.)

30. Van Loon received those reports "as often as daily and as far out as maybe once a week." Van Loon Tr. at 32:5-7.

31. At numerous times, there were no, or not enough, technicians (Field Service Representatives or "FSRs") available to install or service the machines. At such times, Wilson would have to work on the machines. Wilson Tr. at 28:18-29:6; 35:9-16; 38:2-25; LeBlanc Tr. at 18:16-19; 32:9-33:9; Van Loon Tr. at 42:2-8.

32. For example, although Wilson was at the Monarch facility for ten months, the installation technician from one of the equipment manufacturers (Homag) was only there for six weeks. Wilson Tr. at 32:24-33:7.

33. That technician introduced himself to Wilson as the "installation supervisor", and apparently believed he (the technician) was there strictly to *oversee* the installation. Wilson Tr. at 31:24-32:19; 60:17-61:19. *See also id.* at 65:2-9.

34. Wilson's "boss informed [Wilson] that [he (Wilson)] would be [the Homag installation technician's] extra set of hands on the installation . . .." Wilson Tr. at 44:18-20.

35. Wilson, therefore, assisted with the installation, and later, serviced the six Homag machines at Monarch. Wilson Tr. at 42:5-14; 43:17-45:7.

> Q. [W]ere there any Stiles guys designed (sic) to do the Homag equipment?
> A. Yes, there was. It was me.
> Q. There was no other technician from Stiles?
> A. No.

Wilson Tr. at 41:17-21.

36. Wilson's supervisors had told him to "do more hands-on" and "wrenching and fixing equipment." *Id.* at 96:18-97:18.

37. Chuck Van Loon, Stiles' service manager, told Wilson he was to try to fix a machine before calling in a technician. Van Loon Tr. at 53:8-23.[4]

38. Wilson testified as follows regarding the manual labor he performed:

> A. I couldn't get no help, nobody to come down, so I opened my tool box up and I jumped inside the equipment and worked on it for a full day and a half . . ..
>
> * * *

[4] Having Wilson service the machines saved Stiles and/or the customer the travel expenses associated with bringing in a FSR. Van Loon Tr. at 53:24-54:11; 81:24-85:2.

A. There was nobody available to come work on the problems.
Q. Nobody from where?
A. Stiles.
Q. You made a call and asked for somebody to come down and you were told that nobody was available that day?
A. Nobody was available for weeks.

Wilson Tr. at 57:11-58:4.

39. Wilson testified that:

> After the projects were completed, [he] was abandoned at the customer for the after-installation support. So any light to medium problems on the machines which required conversing with Germany to get answers on fixing equipment, to read engineering machines (sic), and working with local machine shops, and installing the parts on the equipment, or tracking down replacement parts that got shipped to the customer and installing them, that's what [he] was there to do.

*Id.* at 86:10-19.

40. Wilson wore a:

> [M]echanic [jump]suit, [drove] aerial lifts and install[ed] dust collection pipes, and jump[ed] in the machines and jump[ed] out, and ma[de] adjustments to keep the customer's machine's running . . ..

*Id.* at 101:1-7.

41. [W]hen [Wilson] started performing the job as a technician, driving forklifts, installing equipment. Even to the point of running production equipment at Monarch when their operators didn't show up because they had to get the production out, [he] said, [he's] not doing anything different that a technician does.

*Id.* at 115:15-22.

42. On February 24, 2003 Chuck Van Loon, Mr. Wilson's direct supervisor, sent an email to several Stiles employees, including a company vice president, stating in part:

> I have informed Furgus Wilson to ask now (sic) Kraftmaid for purchase order numbers that we can invoice the time . . . their maintenance dept. asks Furgus to work on Stiles machines that are out of warranty. They continue to call him on the weekends and after hours for support, at which time Furgus often comes in and helps get them running.

> *The amount of time Furgus is putting into Kraftmaid doing service type work, (getting lines to run), continues to increase. The other responsibilities I have given to him and Tom Anderson would like for him to do is not getting done due to him being called down to the floor constantly by production or maintenance.*

Def. Ex. A-1 at 1-2 (emphasis supplied).

43. Van Loon testified that his may have been going on since Wilson began at Kraftmaid. Van Loon Tr. at 68:20-24. Nevertheless, Van Loon never told Kraftmaid not to call Wilson to work on the machines. Van Loon Tr. at 73:22-75:23.

44. Wilson could not refuse to perform the manual labor when Kraftmaid called him. Van Loon Tr. at 78:22-79:5.

45. Van Loon had no reason to question Wilson's statement that he (Wilson) was spending "more time on the floor keeping the machines running . . . than managing the [recommended maintenance programs]." Van Loon Tr. at 83:5-19.

46. Similarly, on March 16, 2004, Don LeBlanc, defendant's Manager-Specialty Products, sent an email to several members of Stiles' upper management, including the CFO, stating in part:

> It is now time to give Furgus the proper support. The Homag technician is ready to leave on Wednesday and there is no one to help Furgus to get this gluing issue under control. . . .
>
> * * *
>
> I feel we [need] somebody . . . to assist Furgus. *Remember that Furgus is the <u>onsite coordinator</u> and not the primary technician.*

Def. Ex. D-1 (emphasis supplied).

47. LeBlanc questioned why Wilson was attempting to repair the machines himself, rather than calling in technicians. LeBlanc Tr. at 22:2-23:18.

48. LeBlanc raised the issue of Wilson performing the repair work himself with LeBlanc's superiors at Stiles, but it took 3-4 months to resolve the issue. LeBlanc Tr. at 24:1-25:7.

49. When asked if the amount of manual labor Wilson was performing was interfering with Wilson's other duties, LeBlanc testified that "it was in lieu of his management responsibilities." LeBlanc Tr. at 25:17-21.[5]

50. Wilson played no role in designing or selling the Kraftmaid project. Wilson Decl. ¶ 8. Similarly, Wilson had no role at all in planning or selling the Monarch project. LeBlanc "sold and engineered the project." LeBlanc Tr. at 19:5-8. Wilson's first involvement was when the equipment was delivered to Monarch. Wilson Tr. at 66;15-67:7. He first learned what machines would be used when the service manager informed him. Wilson Tr. at 31:7-12.

51. Field Service Representatives ("FSRs") "install equipment, service equipment." Van Loon Tr. at 21:23-25. FSRs are the people who normally perform "wrenching" at customer locations. *Id.* at 24:8-14. FSRs earn anywhere from $36,000 to $134,655.76. May 5, 2006 letter from Paul Sorenson to Jeffrey Pollack attached as Exhibit I to the Pollack Decl. Stiles pays FSR's overtime. *Infra* ¶ 57.

52. Wilson did not dress as a Project Manager – in slacks, a shirt and tie (*see* job description, Def. Ex. C-1 at 3). Rather, he dressed like the Stiles' FSRs – in jeans and a Stiles polo shirt; nobody from Stiles ever told him he was dressing inappropriately. Wilson Tr. at 154:15-156:6.

---

[5] After a break in the deposition during which Van Loon spoke with defense counsel, defense counsel asked him to clarify his testimony and he backed-off this testimony.

53. Wilson did not participate in developing the Project Management department. Wilson Tr. at 100:5-19.

54. Wilson completed and submitted weekly time sheets, showing the hours he worked. Wilson Tr. at 78:1-8. A print-out obtained from defendant of the hours plaintiff worked establishes that plaintiff worked 1,919.5 overtime hours without compensation from December 20, 2001 to the date he resigned. Exhibit H to the Pollack Decl.

55. Wilson complained about how many hours he was working, Van Loon Tr. at 48:7-25, and that Stiles was not paying him overtime. Wilson Tr. at 115:10-22; 117:5-25; 119:24-122:25; 126:1-8; 133:2-9. Wilson also stated that he should not be performing so much manual labor. Van Loon Tr. at 51:10-52:3; Ege Tr. at 18:19-19:8; 28:2-22.

56. Stiles never attempted to calculate how much manual labor Wilson was performing, or to limit the amount of manual labor Wilson performed. Van Loon Tr. at 38:13-17, 52:4-7, 54:13-16, 62:10-16; LeBlanc Tr. at 31:13-20.

57. Stiles was aware of the requirements of the FLSA; Stiles paid its Field Service Representatives, scheduling coordinator, and National Technical Support Specialist overtime. Corner Tr. at 16:23-17:19; Van Loon Tr. at 20:18-22; Ege Tr. at 10:11-13.

Dated June 20, 2006

Jeffrey D. Pollack
MINTZ & GOLD, LLP
470 Park Ave. South
10th Floor Tower N
New York, NY 10016
(212) 696-4848
(212) 696-1231 (fax)

Thomas Cronin
GUNNING & LAFAZIA, INC.

56 Pine St. – 7th Fl.
Providence, RI 02903
(401) 521-6900
(401) 521-6901 (facsimile)

Attorneys for Plaintiff